**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**LAURENE M. CLARIDGE,**

     **Plaintiff,**

**vs.**                                 **Case no. 5:05cv153-RS**

**CONTINENTAL CASUALTY COMPANY,**

     **Defendant.**

_____/

<u>ORDER</u>

The parties have submitted this case for decision on the issue of liability based upon the Court's review of the parties cross-motions for summary judgment (Docs. 21, 24, 31, 34), trial briefs (Docs. 75, 77, 82, 83), findings of fact (Docs. 71, 76) and the administrative record (Docs. 23, 70).

<u>I. Facts</u>

Laurene Claridge (Claridge) was employed by Scholastic, Inc. (Scholastic) as a district manager beginning on October 10, 1995. Claridge was a participant in an employee benefit plan (Plan) sponsored by Scholastic. The Plan was funded by a group long term disability (LTD) policy issued by Continental Casualty Company (CCC). (Doc. 1, Complaint, ¶¶ 1-6.) The terms of the policy gave the issuer the discretionary authority to determine a claimant's eligibility for benefits. (Doc.1, Exhibit A, p.12.)

Claridge was involved in three accidents over the "last few years" including falling from a horse, falling over some boxes, and an automobile accident that took place on February 20, 2003. (Doc. 23, Administrative Record, H 120-121.)[1] As a result, Claridge filed a claim for LTD benefits on or about October 13, 2003, in which she alleged that

---

[1] For the remainder of this order, the Court will cite to documents from the administrative record using only the document's Bates number – e.g. H 145.

she was unable to work since the date of the automobile accident. (H 105.) Claridge claimed that she suffered from headaches, neck pain, and lower back pain. (H 117, 789, 806-807.) More specifically, Claridge had been diagnosed with cervical herniated nucleus pulposus (HNP) and bilateral carpal tunnel syndrome (CTS). (H 105.)

According to the LTD policy, a claimant's application for LTD must include, among other things: 1) "The prognosis of the [claimant's] *Disability*" ; 2) "Objective medical findings which support [the claimant's] 'disability'; and 3) "the extent of [the claimant's] disability, including restrictions and limitations which are preventing [the claimant] from performing [the claimant's] regular occupation.'" (H 141.) "Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [claimant's] disabling condition(s)." [2] (Id.) Claridge's original application for LTD benefits included medical information from Drs. McKeown, Jacob, and Reed. (Id.) Dr. McKeown performed MRIs on Claridge's cervical spine and lumbar spine. (H 821, H822.) On June 18, 2003, Dr. McKeown reported that the MRI of the lumbar spine showed that "there are no large lumbar disk herniations" and "mild degeneration" in the L4-5 and L3-4 regions of the lumbar spine without herniation. (H 821.) The MRI of the cervical spine revealed "no evidence of spinal stenosis or significant disk herniation" and "previous fusion surgery at C5-6 and C6-7, with no apparent complication." (H 822.)  On June 18, 2003, Dr. Jacob, a neurologist, reported that the "electrodiagnostic impressions" were: 1) "carpal tunnel syndrome bilaterally," 2) "subtle signs of C5 C6 radiculopathy," and 3) "the paravertebral muscles were normal on the right side." (H 823.)

CCC also considered additional information from Dr. Michael Reed, Claridge's orthopedic surgeon. Dr. Reed initially completed a Physician's Statement form in which he listed Claridge's diagnosis as "HMP Cervical, Carpal Tunnel Syndrome" and summarized the complications as "neck pain," "bilateral shoulder pain," "back pain," "leg pain [and] numbness," and "hand pain." (H 819.) In the same document, he described Claridge's limitations as "No lifting greater than 40 lbs" and "No prolonged overhead activity." (H 820.) Dr. Reed also stated that Claridge's prognosis was "fair" without any

---

[2] The terms "disability" and "regular occupation" are defined in the policies and later in the Court's opinion.

elaboration, and that Claridge could return to work on September 15, 2003. (Id.) On December 2, 2003, CCC sent Dr. Reed a Functional Assessment Tool (FAT), which was completed and signed by him on December 8, 2003. (H 810.) The FAT asked Dr. Reed several questions including: "Do you feel your patient is currently capable of performing full-time work which involves making in-person sales calls, travel by motor vehicle, and lifting 25-30 pounds occasionally?" (H 810.) Dr. Reed responded by checking the "yes" box underneath the question without any further explanation. (Id.) In a letter dated January 6, 2003 [sic], Dr. Reed stated that his FAT response was an error because Claridge "is in fact off of work and has been off of work." (H 803.)

In addition to the medical evidence submitted by Claridge, she spoke with a claims representative (representative) from CCC on November 20, 2003, about her daily activities. (H 120-121.) The most relevant parts of that conversation, as recounted by the representative, are summarized below:

- Claridge was in pain "24/7" (H 121.)
- The pain pills she took did not provide relief and "only give her headaches." (H 121.)
- "When she is feeling better, she will cook a large quantity of food so she can have it to microwave later." (H 121.)
- On a "good day" she could prepare breakfast, and on a "bad day" she found it difficult to walk to the front door. (H 121.)
- She "has difficulty turning her head all the way left or right." (H 121.)
- She could "go on the internet or watch TV, but after an hour she [would] have to change positions." (H 121.) When the representative asked Claridge to confirm that she could "be on the internet for an hour", Claridge responded that "it may be less than an hour" and "she may have to change positions after 20-30 minutes."
- "Some times [sic] she is so exhausted that she will just lay down and use some ice on her neck. She said it helps the pain but the muscle spasms are worse after 10-15 minutes of lying down on it." (H 121.)
- "[S]he drives as little as possible and will only drive herself to appointments or things near the house." (H 121.)  The maximum time Claridge was physically

able to drive was "half an hour."

- Claridge had "hired a cleaning lady to do housework." (H 121.)

- Claridge advised that her doctors had diagnosed her with carpal tunnel syndrome and fibromyalgia. (H 121.)

- She was "able to bathe, dress, and groom without difficulty." (H 121.)

Claridge described her job duties to the representative as follows:

> [Claridge] advised she received boxes at her house that weighed a lot. She said the air label on the one she tripped on weighed 56lbs...The boxes are supposed to be limited to 25 lbs. She received 10-50 boxes a month. She had a company laptop and spent some time doing reports. Most of the time she was out on the road. Probably 40 out of 52 weeks she was in another city. When she arrived she would go to sales appointments. She would set up her sample case in offices or conference rooms and speak to the customers for 1-3 hours. The sample case weighed 25-30 lbs.

(H 121.)  Claridge also advised her employer that she was "able to do the job out of her home without the travel."( H 120.) Nonetheless, Scholastic chose to terminate her in September 2003 and eliminate the position. (Id.)  On December 22, 2003, a CCC representative spoke with Claridge's supervisor, Margaret Coffee concerning Claridge's job duties. The representative summarized her conversation with Coffee as follows:

> Discussed [Claridge's] job description. She advised sales reps have to carry materials into the stores to make presentations. She said they can make "two trips or ten trips" if they cannot carry it all at once. She said most sales reps use wheeled carts to move their materials. She advised that she doesn't know if [Claridge] took a computer into store. She said [Claridge's] position requires a lot of driving, but sometime [she] could fly to locations.

(H 117.) On December 30, 2003, a claims administrative record (CAR) entry was made summarizing Claridge's medical condition and providing the underlying reasons for denial of her claim:

> [Claridge] underwent a bi-level cervical fusion in October 2002 and returned to work. [Claridge] was involved in a car accident on 2-20-03 and went OOW

again. Her treatment provider, Dr. Reed, did not indicate on claim form that he advised her to cease work. The limitations he gave her did not preclude her from performing her job duties. A FAT [Functional Assessment Tool] was sent to clarify this information and Dr. Reed indicated [Claridge] is able to perform her job duties on a full time basis. Will send letter to [Claridge] advising that we are unable to honor her claim for benefits.

(H 117.) In a letter dated January 5, 2004, CCC's administrator denied Claridge's LTD claim. (H 141-142.) The letter set out the reasons for the denial, including the results submitted by Claridge's physicians (i.e. Drs. McKeown, Jacob, and Reed), Claridge's own description of her capabilities and limitations, and Claridge's job description as provided by Scholastic. (Id.)

On June 16, 2004, Claridge's attorney sent a letter to CCC requesting an appeal of the initial decision denying both of her claims. (H 799-800.) On December 1, 2004, CCC informed Claridge's attorney that the "Company's decision to decline benefits was correct." (H 126-128.) The letter stated that CCC's Appeals unit had reviewed all of the evidence submitted by Claridge in her initial application along with the additional evidence provided by Claridge during the appeals process. (Id.) This additional evidence included the following medical information: records from Dr. John Renick; statements from Russel Lord, licensed massage therapist, and Drs. Joseph and Reed; medical records from Drs. Kamel Elzawahry,  Reed, Joseph, and Baker; and medical records from Gulf Coast Rehabilitation Center. (Id.) In addition, the Appeals unit hired Dr. Barry Turner, a medical consultant board certified in orthopedic surgery to review Claridge's records and give his opinion regarding Claridge's "limitations and restrictions as of 2/20/03 and beyond." (H 779.)

The denial letter noted that the LTD policy "states for the first 24 months that you must be unable to perform the material and substantial duties of your regular occupation. Please note that "**Regular Occupation**" means the occupation that *You* are performing for income or wages on *Your Date of Disability*. It is not limited to the specific position *You* held with *Your* employer." (H 127)(emphasis in original). After "independently and thoroughly" reviewing the evidence presented by Claridge, the Appellate Unit summarized its findings as follows:

When reviewing the information presented, we considered all the medical

findings which consist of symptoms, signs, and laboratory findings. Symptoms were considered, including pain, along with the extent to which the signs and laboratory findings confirm the symptoms and the impact the findings would have as far as your client's [i.e. Claridge] ability to function on a daily basis and how it would affect your client's ability to perform her regular occupational work activity also taking into consideration the physical demands of her regular occupational work activity as District Sales Manager.

Again, the findings on physical/clinical examination have not provided findings that would support your client was not capable of performing her regular occupation work activity as of 2/20/03 and continuing to the present. This was concurred by Dr. Michael Reed and ...Dr. Barry Turner of whose opinion and expertise we further relied on. Further, your client's self-reported activities of daily living are not commensurate with functional restrictions/limitations that would preclude her from working as well.

(H 127.)

Claridge filed a Complaint against CCC on July 29, 2005. (Doc. 1.) During the pretrial conference, the parties agreed that the Court should determine whether the administrator's decision was incorrect based on the parties' trial briefs and their responses. Subsequently, both parties filed trial briefs and responses. (Docs. 75, 77, 82, 83.)

## II. Claridge's Job Desciption

The parties disagree over Claridge's job description and the duties she was obligated to perform in her position as a district manager. CCC summarizes Claridge's job duties as follows: " (a) making in person sales calls to approximately 50 bookstore and wholesale accounts in seven states in the southeastern united states; (b) driving to accounts from home, office or hotel; ( c) presenting front list titles to booksellers; (d) maintaining backlist inventory by computer or manually; and (e) carrying 30-50 pounds of sales material into bookstores for her sales appointments. A typical work day consisted of driving to a store for an appointment, then driving to another store for another appointment, and then returning home to her home, office or hotel." (Doc. 71, Defendants' Proposed Findings of Fact, p. 5).

Claridge's summary of her job duties include some noticeable differences: First, Claridge specifies that her driving duties included an "average of 4 hours/day/maximum 9-10 hours a day"; Second, she was required to attend "3 sales conference meetings

per year requiring air travel and sitting for 12 hours in meetings/meals"; Third, she was obligated to attend "1-2 ABA regional meetings each year, requiring [her] to set up and dismantle booth, move and open boxes, and stand 8-10 hours in [a] booth." (Doc. 76, Plaintiff's Proposed Findings of Fact, p. 3-4).

Claridge's employer, Scholastic, also provided CCC with Claridge's job description in a document titled, "District Sales Manager, Southeast Job Description." (H 815.) The document provided that Claridge's job duties included: 1) making in-person sales calls to approximately 50 bookstore and whole sale accounts in seven states in the southeastern U.S.; 2) driving to accounts from home office/hotel (average sitting in car: 4 hours/day/maximum 9-10 hours a day); 3) carrying 30-50 lbs of sales materials into account during 1 to 4 hour meetings and taking orders; 4) attending 3 sales conference meetings per year requiring air travel and sitting for 12 hours in meetings/meals; and 5) attending 1-2 ABA regional meetings each year, requiring employee to set up and dismantle booth, move and open boxes, and stand 8-10 hours in booth. (Id.) Claridge's supervisor, Margaret Coffee, provided further details regarding Plaintiff's job duties to the claims representative. Coffee stated that Scholastic's sales representatives can make ""two trips or ten trips" if they cannot carry all the material in at once and that the representatives have access to "wheeled carts" to move their materials. (H 117.)  The CAR also contains a notation in which the representative describes the claimant as "a 45 yr old female sales mgr, occ requires travel by car 4 hrs/day, moderate walking, lifting/carrying 30-50 lbs (books)..." (H 113.)  Based on all of this information, and Plaintiff's personal testimony (H 120-121), the Court finds that the Scholastic's job description as provided for in its written job description is correct and as such, it will be used in determining whether the administrator correctly denied Claridge's application for LTD benefits.

<u>III. Terms of the Contract</u>

This section will set out the material terms of the LTD contract signed by Claridge. (H 3-24.) In order to be eligible for LTD benefits, the LTD contract provided that a claimant must have a "disability." "*Disability*" is defined by the LTD contract as "during the *Elimination Period* and the following 24 months, *Injury or Sickness* causes

physical or mental impairment to such a degree of severity that *You* [i.e. the claimant] are: 1) continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and 2) not working for wages in any occupation for which You are or become qualified by education, training or experience. (Doc. 1, Complaint, Attachment A, p. 14) (emphasis in original).[3]  The "Elimination Period" is " a period of continuous *Disability* which must be satisfied before [the claimant] is eligible to receive benefits..." (<u>Id.</u> at 15) (emphasis in original).  "Injury" means "bodily injury caused by an accident which results, directly and independently of all other causes, in *Disability* which begins while [the claimant's] coverage is in force." (<u>Id.</u> at 22.)  "Sickness" means sickness or disease causing *Disability* which begins while [the claimant's] coverage is still in force." (<u>Id.</u> at 23.)  "Material and Substantial Duties" are defined as "the necessary functions of [the claimant's] *Regular Occupation* which cannot be reasonably omitted or altered. (<u>Id.</u> at 22.) (emphasis in original). Finally, "Regular Occupation" is defined as "the occupation that [the claimant is] performing for income or wages [on the claimant's] *Date of Disability* [and] is not limited to the specific position [the claimant] held with [the claimant's] employer. (<u>Id.</u> at 23)(emphasis in original).

<u>IV. ERISA's Legal Standard</u>

The underlying factual circumstances and interpretation of the plan determine whether a plan's administrator has properly denied a claim. On February 1, 2006, the Court instructed the parties to submit motions for summary judgment addressing whether the plan administrator's decision was "*de novo* wrong." (Doc. 20.) After determining that a material dispute in the facts precluded a decision at the summary judgment stage (Doc. 66), the parties submitted trial briefs and responses. The trial briefs, motions for summary judgment, and administrative record will be reviewed under the standard set out in the Eleventh Circuit's decision in <u>Williams v. BellSouth Telecommunications, Inc</u>., 373 F.3d 1132, 1138 (11th Cir. 2004), in which the court provided a multi-step approach for "judicially reviewing virtually *all* ERISA-plan benefit

---

[3]  The definition of what constitutes a "disability" after the first twenty four months is different. Whether Claridge's disabilities would meet that standard is beyond the scope of this order.  (Doc. 1, Complaint, Attachment A, p. 14.)

denials."

The first step in an ERISA-plan benefit denial is to "[a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e. the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision." See also, HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001)(holding that "[r]egardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.' ") "Wrong" in the context of a court's *de novo* review of an administrator's denial is defined as "the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." HCA Health Services of Georgia, Inc., 240 F. 3d at 994 n.23 (11th Cir. 2001).

Should the court find that the administrator's decision was *de novo* wrong, it must then proceed to "determine whether he was vested with discretion in reviewing claims." Williams 373 F.3d at 1138. It is undisputed that CCC's administrator was vested with discretion, and as a result, "[i]f the administrator's decision is '*de novo* wrong' and he was vested with discretion in reviewing claims" the court must review the decision under the deferential arbitrary and capricious standard in order to determine whether "reasonable grounds" supported the decision. Id. The inquiry under the arbitrary and capricious standard will occur as follows:

> If the court determines that the claims administrator's interpretation is "wrong," the court then proceeds to decide whether "the claimant has proposed a 'reasonable' interpretation of the plan." Lee v. Blue Cross/Blue Shield, 10 F.3d 1547, 1550 (11th Cir.1994). Even if the court determines that the claimant's interpretation is reasonable, the claimant does not necessarily prevail. At first glance it seems odd that a reasonable interpretation would not automatically defeat a wrong interpretation. The reason the claimant's reasonable interpretation does not trump the claims administrator's wrong interpretation is because the plan documents explicitly grant the claims administrator discretion to interpret the plan. See Brown, 898 F.2d at 1563 (stressing the importance of allowing an insurance company the benefit of the bargain it made in the insurance contract). We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review

is that a court defers to the discretion afforded the claims administrator under the terms of the plan. <u>See</u> <u>Firestone</u>, 489 U.S. at 111, 109 S.Ct. at 954 <u>quoting</u> <u>Restatement (Second) of Trusts</u> § 187 (1959) ("[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion").

<u>HCA Health Services of Georgia, Inc</u>., 240 F. 3d at 993 (11th Cir. 2001). If there are no reasonable grounds to support the administrator's decision, the court must end the inquiry and reverse the administrator's decision; however, if reasonable grounds do exist for the decision (despite being *de novo* wrong) the court must determine if the administrator operates under a conflict of interest. It is undisputed that there was a conflict of interest in this case, and as a result, no analysis is necessary with respect to this issue. Thus, since there is a conflict of interest, the final stage of review would involve affirming or denying the administrator's decision under a heightened arbitrary and capricious review. Defining this standard with any degree of particularity is difficult, though the Eleventh Circuit has provided the following guidance:

> We described "heightened arbitrary and capricious review" supra as somewhere between the *de novo* and "mere" arbitrary and capricious standards. But where is that "somewhere"? Supreme Court decisions have not explained it. <u>See</u> <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 390-94 (3rd Cir.2000). "[C]ircuit courts agree that a conflict of interest triggers a less deferential standard of review ⋯ [but] ⋯ differ over how this lesser degree of deference alters their review process." <u>Chambers v. Family Health Plan Corp.</u>, 100 F.3d 818, 825 (10th Cir.1996).

<u>Williams</u> 373 F.3d at 1138. As it is undisputed that the administrator was operating under a conflict of interest, under the heightened standard the burden shifts to the Defendant to prove that "his plan interpretation was not tainted by self-interest." <u>Id</u>. The <u>Williams</u> court held out the following guidelines for determining whether an administrator's decision was tainted by self interest:

> A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant. But, if the administrator can demonstrate a routine practice or give other plausible justifications-such as benefitting the interests of other beneficiaries-judicial deference to it may be granted, since "[e]ven a

> conflicted [administrator] should receive deference when [he] demonstrates
> that [he] is exercising discretion among choices which reasonably may be
> considered to be in the interests of the participants and beneficiaries."

<u>Id.</u>(internal cites omitted)[4]

## V. Discussion

### A. *De novo* review

CCC contends that the decision of the administrator was correct for the following reasons: 1) Claridge's diagnosis and alleged pain are insufficient to meet the required threshold for the award of LTD benefits; 2) the administrator was correct to rely on the medical opinion of Dr. Turner; and 3) the administrator correctly weighed the medical evidence presented to it. Claridge argues that the administrator was incorrect for the following reasons: 1) the administrator did not afford the appropriate weight to the opinions of Claridge's treating physicians and 2) the administrator incorrectly relied upon Dr. Turner's opinion. Under the *de novo* standard of review, it is undisputed that Claridge bears the burden of proving she is entitled to the benefits she seeks. Since there is no evidence that Claridge was working for wages during the relevant period in any occupation for which she is or became qualified by education, training, or experience, in performing a *de novo* review, the Court will focus on determining the nature and extent of Claridge's injury or sickness, if any, and whether such injury or sickness, as defined in the LTD contract, is of such severity so as to preclude Claridge from continuously performing the material and substantial duties of her regular occupation.

---

[4] <u>Williams</u> admitted that this burden-shifting approach had only been applied in plan interpretation (and not factual determination) cases. This case, like <u>Williams</u>, is a factual determination case. As <u>Williams</u> did not reach this stage, it did not offer an explicit endorsement that such standard was equally applicable to factual determination cases. However, the court did conclude that while "we leave the issue to another day, but proffer the above framework to assist future determinations." <u>Williams</u>, 373 F.3d at 1139. <u>See also</u>, <u>Featherston v. Metropoliotcan Life Insurance Co.</u>, 223 F.R.D. 647, 654 (N.D. Fla 2004).

i. Claridge's Medical Diagnosis

Claridge's ailments include cervical HNP, bilateral CTS, fibromyalgia, myofascial dysfunction, and carpal tunnel, though it is worth noting that Claridge did not list carpal tunnel syndrome on her initial application among the illnesses affecting her ability to perform her job. However, since the administrator considered Claridge's carpal tunnel syndrome in her decision, it is proper for the Court to consider such evidence as well.

The parties primary dispute boils down to how Claridge's medical results and testimony should be interpreted and whether that information supports Claridge's contention that she has an injury or sickness that would prevent her from performing her job as a district manager. Since the Court has already resolved the factual conflict between the parties as to the specific job duties of a District Manager at Scholastic, a *de novo* review to determine whether Claridge's medical condition precludes her from performing those duties is now appropriate.

The depositions of Claridge's treating physicians provide first hand evidence of any injury or sickness that Claridge may have and what limitations those disabilities place upon her ability to perform the job duties of a district manager. After a thorough review of the medical results and testimony of the doctors involved in treating and evaluating Claridge' s condition, it is clear that the opinions of her treating doctors - e.g., Drs. Reed, Joseph, and Jacob - are particularly important in this case since they were the only ones to personally examine Claridge, the subjective nature of some of Claridge's disabilities/symptoms, and the fact that CCC's medical consultant, Dr. Barry Turner, relied on those same doctors in reaching his conclusion that Claridge's disabilities did not preclude Claridge from performing her job. The administrator "primarily" relied on Dr. Turner's report and conclusion in denying Claridge's application for LTD benefits. (Doc. 82, Defendants' Response to Plaintiff's Trial Brief, p.1.) While placing value on the testimony of Claridge's physicians, the Court is also well aware of the Supreme Court's caution in Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), that:

> [C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they

credit reliable evidence that conflicts with a treating physician's evaluation...."[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician."

See also, Shaw v. Connecticut General Life Ins. Co., 353 F.3d 1276, 1287 (11th Cir. 2003).

ii. Testimony of Dr. Reed

Since the findings of both Dr. Turner and Dr. Reed merited specific mention in the administrator's final rejection of Claridge's claim for LTD benefits, their opinions concerning Claridge's condition are particularly noteworthy.  Dr. Reed's deposition testimony will be reviewed first since many of the other physicians treating Claridge deferred to Dr. Reed's judgment on Claridge's ability to work and Dr. Reed's opinion was relied on (at least in part) by Dr. Turner in making his final recommendation to the administrator. Prior to reviewing Dr. Reed's testimony, it is worth reiterating the Court's previous pronouncement that  "Dr. Reed's testimony is rife with inconsistencies, and the parties rightly claim that his testimony supports both of their cases."  (Doc.66.)

At the outset of his deposition, Dr. Reed summarized Claridge's diagnosis as follows:

> "She had a right anterior cervical discectomy and interbody fusion on 10-15-2002 for her cervical stenosis and myelopathy... Then she was involved in a motor vehicle accident on 2-20-3003. At the time, [Claridge's] diagnosis was cervical disc disease with cervical strain, no radiculopathy or myelopathy, lumbar disc disease with lumbar strain, no evidence of radiculopathy, [and] trochanteric bursitis, right hip...After that, she was having some neck, back and shoulder pain...She was also diagnosed with carpal tunnel syndrome....I treated her nonoperative for that...And she was also being followed concurrently by Dr. Joseph, who had done some trigger point injections, as well as epidural steroids.

(H 204, 27:24-25; H 205, 28:1-2, 28:5-10, 28:14-15, 28:21-22, 24; H 206, 29:1-4.)

Apparently in reference to the time period after the auto accident, Dr. Reed recalled his recommendation with respect to Claridge's ability to fulfill her job duties:

> At that time, she did not feel she could do her job with the amount of traveling that she had to do primarily and the products that she had to carry, getting in and out of airplanes, you know, doing a lot of driving, and **I concurred with that, the fact that she was not capable of adequately doing that job.**

(H 206, 29:5-11) (emphasis added). Next, Dr. Reed responded to several direct

questions regarding the extent of Claridge's disability and if such disabilities precluded

her from working as a District Manager at Scholastic:

> Q. In regard to your opinion or your concurrence with Ms. Claridge that she
> cannot do her job because of the extensive traveling, when would you say
> her inability to do that job began?
> A. Following the second accident.
> Q. Okay. At the time of the auto accident - -
> A. Right.
> Q. - - in February or January '03?
> A. Right.
> Q. Can you tell us if you foresee her inability to do her past job to continue
> into the future, or what do you see as her prognosis in terms of what kind of
> activity or word she can do?
> A. **I think she can work, but I don't think she ought to be doing
> something that requires, you know, any lifting greater than 30 pounds,
> driving for long periods of time, as far as a lot of traveling.**

(H 206, 29:17-35; H 207, 30:1-8)(emphasis added). Taking Dr. Reed's deposition

testimony at face value, the limitations placed on Claridge with respect to lifting and

driving would quite obviously preclude Claridge from doing her job. However, some of

this testimony is difficult to square with his testimony before, after, and during the

remaining portion of the deposition. For example, with respect to Claridge's weight lifting

restrictions,  Dr. Reed's Physician Statement described Plaintiff's limitations as "No

lifting greater than 40 lbs" and "No prolonged overhead activity" (H 820), while in

response to the FAT question, he agreed that she could lift 25-30 lbs. occasionally. On

the matter of whether Claridge could return to work, Dr. Reed stated that the reason he

agreed Plaintiff was ready to go back to work was Plaintiff's subjective belief that she

could go back to work. (H 207-208.) In addition, according to Dr. Turner's summary of

his phone conversation with Dr. Reed, Dr. Reed felt that Plaintiff should be "capable of

working full time and should be capable of that sort of activity." (H 781.) These opinions

seemingly contradict Dr. Reed's letter to CCC (which was submitted after Dr. Reed

completed the FAT) in which he stated that Claridge " is in fact off of work and has been

off of work" (H 803) and Dr. Reed's suggestion in the deposition that the reason he

indicated Claridge could return to work on the FAT was to give Claridge an opportunity to go back to work, since this is what she wanted to do (and presumably not what he would have recommended from a medical perspective.) (H 208.)

Dr. Reed's response to the Functional Assessment Tool (FAT) and the subsequent letter he sent to CCC retracting his conclusion that Claridge could return to work (H 803) can be used to support either party's case. As stated above, Dr. Reed responded affirmatively to the FAT question sent to him by CCC. While CCC claims that Dr. Reed's affirmative response to the FAT question indicates that Claridge was capable of performing her job duties at Scholastic, this is not the case. First of all, while Dr. Reed indicates that Claridge could lift 25-30 lbs., the FAT question qualifies the lifting requirement with the term "occasionally." A person with such a medical limitation could not fulfill the lifting requirements set out in Scholastic's job description. Second, while Dr. Reed's FAT response could be construed as allowing for unlimited driving, Dr. Reed's subsequent testimony during his deposition and phone interview with Dr. Turner confirms that Dr. Reed believes that Claridge should reduce her driving time - e.g. Claridge should not be doing "any lifting greater than 30 pounds [or] driving for long periods of time." (H 207, 30:5-8.) Based on this information, it is more likely than not that Dr. Reed only allowed Claridge to return to work because she wanted to give it a shot - not because he felt that she was medically able to handle a full time position as district manager.

Despite the inconsistencies in Dr. Reed's testimony, in his most recent comments on the matter, he confirmed to Dr. Turner that he stood by his original recommendation that Claridge could drive, but that she should reduce her travel time and limit her lifting to 25-30 lbs. occasionally. (H 781.)  This is the information that Dr. Turner relied upon (id.) and it is the conclusion that is most consistent with Dr. Reed's overall testimony. Perhaps most importantly, this was the information relied on by the administrator since Dr. Turner's recommendation was the primary basis for denying Claridge's claim.

iii. Dr. Turner's Review of Claridge's Records

It is unquestionable that an administrator can consider the report of a non-treating physician (i.e. independent consultant) in evaluating the merits of an ERISA claim, even if the non-treating physician does not personally examine the claimant, and his opinions are contrary to the recommendations of the treating physicians. Hufford v. Harris Corp., 322 F.Supp.2d 1345, 1359 (M.D. Fla. 2004). This is particularly relevant in a situation where the plaintiff's doctors provide testimony that is less reliable than an independent consultant. In this case, CCC relied "primarily" on the conclusion reached by their independent consultant, Dr. Barry Turner, in denying Claridge's appeal despite testimony from her treating physicians reaching contrary conclusions. (H 130.) After a limited review of Claridge's medical records, Dr. Turner's recommendation to the administrator was as follows:

> It is my opinion that as of 2/23/03 and beyond, she [Claridge] should therefore, be capable of full-time work with the only restriction of no lifting and carrying greater than 25-30 lbs **occasionally**. Otherwise, I would provide no other restrictions/limitations for her. I base this upon the recommendation of Dr. Reed and the fact that she has no abnormal neurologic findings at this time.

(H 781)(emphasis added). According to his report, Dr. Turner reviewed an MRI of Claridge's cervical spine,  Dr. Jacob's [Claridge's neurologist] medical records regarding Claridge's condition, and had personal conversations with Drs. Baker (Claridge's primary care physician) and Reed.  Dr. Turner's opinion that Claridge's only limitation is lifting 25-30 lbs. occasionally was based upon the recommendation of Dr. Reed and his (i.e. Dr. Turner) conclusion that there were no abnormal neurological findings at the time. (H 781.) Based upon the medical evidence cited to by Dr. Turner in his Medical Record Review of Claridge, the reliability of his conclusion must be called into question.

First, in discussing Claridge's case with Dr. Reed, Dr. Turner asked Dr. Reed to clarify the apparent inconsistencies in his previous testimony.  Dr. Turner's report summarizes Dr. Reed's response as follows : " Dr. Reed advised me that he still stands by his original recommendation that she [Plaintiff] can lift and carry up to 25-30 lbs occasionally. She can drive; however, he [Dr. Reed] has suggested that she decrease

the number of trips that she makes on sales visits...He feels that she is capable of working full time and should be capable of that sort of activity." (H 781.) Dr. Turner's reliance upon this conversation with Dr. Reed, in which Dr. Reed confirmed and clarified his FAT recommendation, support Dr. Turner's ultimate recommendation with one significant difference:  unlike his response to the FAT, Dr. Reed opined that although Claridge can drive, she should "decrease the number of trips she made on sales visits" and try to "decrease her travel time." (H 780-781.) This is a significant qualification to Dr. Reed's original recommendation, and neither Dr. Turner or the administrator give any indication why this aspect of Dr. Reed's recommendation was disregarded. See Calvert v. Firstar Finance, Inc., 409 F.3d 286, 297 (6th Cir. 2005)(holding that physician's review of claimant's records was inadequate because he failed to address "head-on and simply seemed to ignore" evidence in the record).

Second, after reviewing Claridge's neurological test results, including the findings of her neurologist, Dr. Jacob, Dr. Turner concluded that Plaintiff had "no abnormal neurologic findings at this time." (H 781.)  Dr. Turner reaches this conclusion despite Dr. Jacob's findings that Plaintiff had "carpal tunnel syndrome bilaterally [and] subtle signs of C5 C6 radiculopathy on the left side..." (H 823.) These findings seem to directly contradict Dr. Turner's conclusion that there were no abnormal neurologic findings. The administrative record contains further evidence of abnormal neurologic findings. For example, Dr. Reed affirmed that Plaintiff had bilateral carpal tunnel syndrome. (H. 208.) In addition, Dr. Elzawahry stated that Plaintiff's electrodiagnostic findings were "consistent with conduction block of the left median nerve at the wrist and compatible with the clinical diagnosis of left tunnel syndrome." (H 253.)  There is nothing in the record to indicate that Dr. Turner reviewed any of these records and made any attempt to reconcile them with his recommendation to the administrator.

Also, while Dr. Jacob's tests reveal that the Phalen sign is negative and there is no Tinel's Sign over the cubital tunnel or ulnar nerve (H 263), Dr. Reed stated on two separate occasions (September 15, 2003, April 12, 2004) that there was a "positive Tinel's sign on the left" and "Phalen's test." (H 265-266.) Yet, there is nothing to indicate that Dr. Turner reviewed any or all of these records or if he did so, why he chose to disregard Dr. Reed's results and rely upon Dr. Jacob's results. (H 779.) The fact that Dr.

Reed's tests occurred after Dr. Jacob's test gives the Court even more reason to question why Dr. Turner did not reconcile these results. If Dr. Turner had not explicitly relied on Dr. Reed's testimony in justifying his final recommendation, the Court might have inferred that Dr. Reed's previous inconsistencies precluded Dr. Turner from giving his results any credence, particularly in a situation where there was conflicting evidence from two treating physicians. However, since Dr. Turner chose to directly rely upon Dr. Reed's recommendations, the fact that he did not reconcile these apparently conflicting results is wrong and unreasonable. In addition, while Dr. Reed told Dr. Turner that Claridge had undergone left carpal release, there is no evidence that any surgery was done to correct the carpal tunnel on that side. (H 783.)

Finally, in recounting his conversation with Claridge's primary care physician, Dr. Bobbi Baker, Dr. Turner states that "Dr. Baker indicates that she had deferred all decisions on work capability to Dr. Reed." (H 781.) Despite this fact, Dr. Turner (and the administrator) should have responded to  Dr. Baker's comment that Claridge "might have problems lifting more than 10 lbs." since this would have provided further evidence that Claridge was unlikely to be able to perform a material requirement of her job. (H 782.)

iv. Remaining Medical Information

Dr. Joseph, Claridge's pain management specialist, stated that when he first saw Claridge, she was suffering from "severe myofascial dysfunction," mild "fibromyaligia" and "occipital neuralgia." (H 189, 12:7-8, 12:10-15, 16:19-24.) After treatment and despite some improvement in her condition, Claridge  "continued to have fairly substantial dysfunction." (H 190, 13:14-16.) Although Dr. Joseph deferred to Dr. Reed with respect to Claridge's ability to perform her job (H 190, 13:17-20), he states that based on Claridge's job duties and medical conditions, she could not "continue to do that job." (H 195, 18:9-10.) This was based on his conclusion that "because of the chronic pain that the - - there is increased pain associated with sitting in one position such that somebody might experience when they're driving for long periods of time. While I think she should probably tolerate that every now and then, I think on a daily, regular basis, that would be too much to expect her to tolerate." (H 195, 18:12-18.) Dr.

Joseph concludes that Claridge's limitations will "probably be permanent." (H 196, 19:5.)

Defendant argues that Dr. Joseph's opinion was "vague and conclusory" and "unsupported by any specific medical information." (Doc. 71, Defendants' Statement of Facts, p.13.) The record does not support Defendant's conclusion. In fact, Dr. Joseph explained quite clearly why he diagnosed Claridge with myofascial dysfunction (H 193, 16:17-18) and how the "chronic pain" that resulted would preclude Claridge from performing her job duties. Dr. Joseph also stated that Claridge had symptoms of fibromyalgia (H 192, 15:21-25), such as "headaches" and "severe sleep dysfunction." (H 193, 16:21-24; H 189, 12:19-21.) In addition, in a situation where a patient suffers from chronic pain, a personal examination by the independent physician would seem to be in order because of the subjective nature of such an illness. It must be recognized that for certain disabilities and symptoms, such as chronic pain, there is little, if any, objective evidence. In such instances, the credibility of the patient is critical in evaluating the merits of claimant's complaint. This is particularly true in a situation where a patient is allegedly suffering from a disease such as fibromyalgia, which is "poorly understood" and that occurs "idiopathic[ally]." (H 191, 14:18-23.)

Russell Lord, Claridge's massage therapist also provided testimony that clearly supports Claridge's claim that she was unable to perform her job duties. The following points from Lord's deposition are particularly relevant:

- Objective medical evidence: Lord claims he felt tightness and muscle spasm on Claridge "primarily"  in the "cervical/vertebral area, C3-C4, referring into the upper thoracic area. Both of the trapezious muscles had numerous trigger points, several areas that were quite tight and restrictive and causing a lack of motion of the cervical area, as well as both shoulders. Also down the lumbar area, the L4-L5 area was tight, but most of her problems were stemming from the upper glut muscles. There were numerous trigger points and spasms in that area." (H 175, 33:20-25; H 176, 34:1-10.)

- In response to a specific question regarding Claridge's complaints "about having difficulty either doing physical activity because of the pain [and]

tightness" and whether such complaints were legitimate based on what he was able to "objectively" identify, Lord responds: "Yes. Based on her, based on my experience in treating other fibromyalgia patients, when it has gotten to this point, yes, it can be very debilitating, very - - you know, cause very limited activities on her part."  (H 179, 2:25; H180, 3:1-4.)

- In response to a question about whether Claridge felt she was "malingering or misrepresenting any of her subjective symptoms" Lord responded "No, I do not. Actually, I have seen some of her symptoms increase as far as the muscular type, which is, you know something that she has no control over. I mean, just going in and palpating some of the areas, they have continually gotten tighter over the last five to six months." (H 178, 1:16-24.)

- In response to a question about Claridge's long term prognosis, Lord responds: "Right up front, I'm not qualified to answer that one as to what the prognosis long term will be with this." (H 180, 3:14-15.) However, Lord then qualifies his response by stating, "I see no reduction in symptoms at this point." (H 180, 3:18-19.)

Lord provides objective medical evidence (e.g."There were numerous trigger points and spasms in that area (H 176, 34:9-10)) and perhaps more critically, provides that Claridge's subjective complaints of pain were supported by this evidence. Thus, while chronic pain alone is not sufficient to disqualify Claridge from performing her job duties, "debilitating" pain and tightness, under any reasonable interpretation of that term, would certainly preclude Claridge from completing the rigorous travel and lifting requirements of her job. Finally,  Lord's unequivocal support of Claridge's credibility is very relevant in evaluating a claimant with a disease such as fibromyalgia where objective tests sometimes fail to provide the complete picture of a patient's disability. The fact that the administrator did not ask Dr. Turner (or another independent consultant) to personally examine Claridge under these circumstances was wrong and unreasonable. The fact that Dr. Turner did not give any  indication that he reviewed Lord's testimony or medical results is even more troubling because of the nature of

Claridge's disabilities.

v. Conclusion

In his rejection letter, the administrator states that because of Claridge's physical/clinical findings, which were concurred by  Dr. Reed, Dr. Turner, and Claridge herself, her appeal was being denied. (H 127.) First, as for Dr. Reed's testimony, it is clear that he (along with Dr. Joseph) felt that Claridge had to reduce the amount of driving she did. As Dr. Turner recounted, Dr. Reed stated that "she reduce the number of trips she makes on sales visits." (H 781.) There is nothing in the record to indicate that Claridge could have continued to perform her job with a reduction in driving. Under any reasonable construction, an average of 4 hours/day in a car (with a maximum of 9-10 hours) would qualify as " a lot of traveling," which is precisely how Dr. Reed described Claridge's driving limitations in his deposition. (H 207, 30:5-8.) Despite a seemingly contradictory response to the FAT question, Dr. Reed reiterated this fact to Dr. Turner when he informed him that Claridge should "try to decrease her travel time." (H 780.) Dr. Turner and the administrator disregarded this evidence along with additional objective evidence from Dr. Joseph, Dr. Baker, and Mr. Lord that supported these facts without any explanation.

As for the weight limitation, Claridge's supervisor provided information indicating that Claridge could make "two trips or ten trips" if she could not cannot carry all the material in at once and utilize a wheeled cart to move the materials. (H 117.)  This information, while helpful, does not seem to correlate with any of the job descriptions provided by Scholastic, Claridge, or CCC. Scholastic's Job Description states that in presenting front list titles to bookseller the task "involves carrying 30-50 pounds of sales materials into account..." (H 815.) If a person in that position could split the materials up, the description should have been appropriately modified. In addition, Dr. Reed's final recommendation, subsequently adopted by Dr. Turner,  was that Claridge was capable of lifting 25-30 lbs "occasionally." Once again, this was supported by Drs. Joseph and Baker and Mr. Lord and disregarded by Dr. Turner and the administrator despite the fact that nothing in Scholastic's job description indicated that the lifting requirement was "occasional."

There is nothing in the record indicating that the administrator or CCC's medical consultant took into consideration the fact that Claridge had to attend three sales conference meetings per year, requiring air travel, in which she would be sitting for twelve hours in meetings and meals and that she had to attend one or two ABA regional meetings each year, requiring Claridge to set up and dismantle a booth, move and open boxes, and stand 8-10 hours in the booth. If her doctors concluded that she should limit her travel time, which predominantly involves sitting (whether it be in a car or a plane), it is logical that sitting in a twelve hour meeting would also be beyond Claridge's physical capabilities. Mr. Lord's testimony, backed up by objective evidence (when possible), supports the fact that the limitations in Claridge's movements would preclude her from sitting in a lengthy meeting. (e.g. H 179-180.) There is nothing in Dr. Turner's report to indicate that he reviewed Mr. Lord's testimony at all. In addition, while there is nothing in the record about the weight of a booth, it likely would exceed the 25-30 lb. limit imposed by Drs. Turner and Reed.

Because of Claridge's carpal tunnel syndrome, which is supported by objective medical results and Claridge's own testimony, Claridge would have found additional difficulty in the performance her job duties, difficulties that would not have enabled her to perform her job duties. See e.g., "She [Claridge] advised that she dropped things from time to time with her left hand, but she didn't know she had a problem. She said that the doctors were saying she has it 'but I never noticed'" (H 120); Dr. Joseph's statement that,  "She also had continued problems with her arm going numb and possibly secondary to carpel tunnel syndrome..."(H 190, 13:21-24); (Dr. Reed's diagnosis that "She does have documented carpal tunnel")(H 213); ( Dr. Reed lists carpal tunnel under the heading "diagnosis" along with "leg pain [and] numbness" under complications)(H819).  Thus, Dr. Turner's conclusions about Claridge's neurological results are belied by these and other medical records and testimony in the record. These results are never discussed or reconciled by Dr. Turner. In addition, despite any lifting requirements that Claridge would have been required to fulfill, the fact that she had continuing problems with "numbness" would have made lifting anything on a consistent basis difficult, if not impossible.

Finally, perhaps the most puzzling aspect of the administrator's denial letter is

her apparent belief that Claridge's self-reported activities support the denial of benefits for Claridge. During that self-evaluation, Claridge reported that "she drives as little as possible and will only drive herself to appointments or things near the house." (H 121.) She also stated that the maximum time she was physically able to drive was "half an hour" and that she "has difficulty turning her head all the away left or right." (H 121.) It is difficult to envision that someone with those physical limitations could perform the duties of a district sales manager or any similar position because of the extensive travel required by the job. In addition, these limitations would make it very difficult to lift anything, set up a booth, sit in a meeting for a lengthy period of time, and stand for several hours. While Claridge's self-evaluation is subjective by its very nature, the fact that none of her doctors felt that she magnified her symptoms in any way, makes her observations credible. In this situation, where Claridge's credibility was a major issue due to the nature of her disabilities, Dr. Turner should have, at a minimum, personally spoken to Claridge to discuss her self-perceived limitations.

Consequently, the Court finds that Claridge would be continuously unable to perform the material and substantial duties of her regular occupation. Therefore, the administrator's decision was *de novo* wrong in denying Claridge's claim for LTD benefits.

B. Arbitrary and Capricious

Under the arbitrary and capricious standard, the Court must determine if despite being wrong, the administrator's decision is nonetheless reasonable. It is clear that the administrator's decision to deny Claridge LTD benefits was complicated by the inconsistent medical evidence and testimony provided by Dr. Reed and CCC's medical consultant, Dr. Turner. Due to the inconsistencies in the medical records about how much Claridge was capable of lifting and how often she was capable of doing so, it was appropriate for the administrator to consult Claridge's supervisor to determine whether Claridge was capable of fulfilling the lifting requirement for her position.  However, it was unreasonable to rely upon that information alone in determining the actual weight lifting requirement for Claridge's job in light of Scholastic's own job description and Claridge's personal testimony. In addition, the administrator's decision that Claridge was capable of fulfilling the weight lifting requirement was unreasonable based upon the testimony

from  Drs. Joseph and Baker, Mr. Lord,  and Dr. Reed's final recommendation to  Dr. Turner that Claridge was capable of carrying 25-30 lbs. **occasionally** (with which Dr. Turner concurred with as well).

It was also unreasonable for the administrator to disregard the travel restrictions imposed on Claridge due to her illnesses. In fact, despite adopting Dr. Reed's recommendations for weight lifting restrictions, Dr. Turner disregards Dr. Reed's recommendation to reduce her travel time. While the administrator provides no rationale for ignoring this critical piece of information, he does state that Dr. Reed's recommendation to reduce travel time would not "preclude" Claridge from performing the material duties in her occupation. (H 127.) Accepting Dr. Reed's explanation for his FAT response, the Court finds his testimony was consistent (and supported by Claridge's other treating physicians) with respect to the limiting the amount of Claridge's travel. There is no indication in the record of how Claridge could have performed her "regular occupational work activity" without fulfilling the driving requirement. This conclusion is buttressed by Scholastic's refusal to consider Claridge's offer to continue working without the travel. (H 120.) In addition, as stated earlier, the fact that Dr. Turner did not personally evaluate Claridge's chronic pain symptoms or consult her pain specialist was unreasonable, particularly in a situation where the disease causing this pain was "idiopathic."

The Court also finds the administrator's interpretation of Claridge's self reported activities to be unreasonable. As a result of these findings, the Court determines that the administrator's decision was wrong and unreasonable.

C. Heightened Arbitrary and Capricious Review

Assuming that the administrator's decision was wrong but reasonable, the Court finds that Defendant would not satisfy the heightened arbitrary and capricious standard of review. As stated previously,  Defendant bears the burden of showing that the "administrator's plan interpretation was not tainted by self-interest." Williams 373 F.3d at 1138.  The Williams court held out the following guidelines for determining whether an administrator's decision was tainted by self interest:

> A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the

claimant. Id. at 1566-67. But, if the administrator can demonstrate a routine practice or give other plausible justifications-such as benefitting the interests of other beneficiaries-judicial deference to it may be granted, since "[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries." Id. at 1568.

Id. Defendant argues that the "federal common law of ERISA amply reflects that having a claimant's medical record reviewed and analyzed by a consulting physician is a routine, court-approved practice in the administration of disability claims." (Doc 82, p.28.) There is nothing incorrect about this statement. However, unlike the Eleventh Circuit's decision in Richards v. Hartford Life and Acc.Ins. Co., 153 Fed. Appx 694, 697 (11th Cir. 2005)  in which the court found that when an independent physician reviewed **all** of the claimant's records "even under the heightened arbitrary and capricious standard [we] could not say that the administrator abused his discretion by relying on the independent reviewing physician's opinion that Claridge was capable of full-time work during the relevant period," there is no evidence in the record that Dr. Turner reviewed all of Claridge's medical records in a thorough fashion. Indeed, there is not even sufficient evidence to conclude that Dr. Turner thoroughly evaluated the evidence he did review for purposes of making his recommendation.

Defendant also argues that since the administrator clearly "demonstrat[ed] that it chose to follow what it reasonably perceived as equally or more objectively reliable data [in denying a claimant benefits, an ERISA administrator] substantially ameliorates any fears that its decision was motivated by self-interest rather than by a good faith effort to exercise its discretion to interpret and apply the plan." Wise v. Hartford Life and Acc. Ins. Co., 403 F.Supp.2d 1266, 1277 (N.D. Fla. 2005). The Court finds that the administrator's disregard for the amount of travel time necessary to fulfill Claridge's job duties combined with the medical evidence indicating that her injury/sickness forced her to reduce the amount of time she could travel, and Scholastic's refusal to compromise on this issue (due to the fact that traveling is a material part of a district manager's job duties) made it impossible for Claridge to perform the material duties of her job, and demonstrate that the decision was motivated by self-interest.

Accordingly,

The decision of CCC's administrator was wrong, unreasonable, and influenced by self-interest. As a result,

1. Judgment is entered in favor of Plaintiff and against Defendant for LTD benefits under the *regular occupation* provision of the policy;

2. The case is remanded to the claims administrator to determine Plaintiff's eligibility for benefits following the *regular occupation* period; and

3. Plaintiff shall file a motion for fees and costs no later than October 31, 2006, after which Defendant will have 14 days to respond.

4. The clerk is ordered to enter judgment in favor of Plaintiff.

**ORDERED** on October 24, 2006.

**/s/ Richard Smoak**
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**